RICHARD E. HEINZELMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Heinzelman v. Commissioner
Docket No. 11529-78.
United States Tax Court
T.C. Memo 1981-218; 1981 Tax Ct. Memo LEXIS 520; 41 T.C.M. (CCH) 1423; T.C.M. (RIA) 81218; May 4, 1981. Richard E. Heinzelman, pro se. Alvin B. Sherron, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined a deficiency in the Federal income tax of petitioner for the taxable year 1974 in the amount of $ 5,011. The sole issue presented is whether petitioner was a resident of a foreign country during the taxable years 1973 and 1974 for purposes of the exclusion provided in section 911 of the Code. [1]
*521 FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibit are incorporated by reference. Petitioner resided in Portola Valley, California, when he filed his petition. He filed a Federal income tax return for the taxable year 1974. Petitioner graduated from Harvard Business School in 1967 and immediately sought overseas employment, wishing to pursue an international career. He was employed in Chile under a contract with Cornell University for one and one-half years, returning to the United States in the spring of 1969 when he secured employment in Washington, D.C., with McKinsey and Company, a consulting firm. He remained in Washington for approximately one year until his employer assigned him to Tanzania where he remained from July 1970 to July 1971. After completing that assignment, he resigned his employment and went to Europe where he studied French. He enjoyed living in Europe and sought employment there, but was unsuccessful. In March 1972, he mailed over 200 letters seeking overseas employment in which he listed his qualifications and accomplishments. As a result of the letters he mailed, he obtained employment with A.C. *522 Forr, a corporation located in Bala-Cynwyd, Pennsylvania. It later changed its name to Anchor Darling Valve Co. (Anchor). Anchor manufactured specialty valves used in nuclear power plants. A typical power plant required such valves costing from $ 3 million to $ 6 million. Petitioner was employed by Anchor to negotiate and oversee a licensing arrangement with Babcock and Wilcox of Spain in Bilbao, Spain. It was also anticipated that he would branch out and develop European markets for Anchor. It was anticipated that petitioner would be present in Bilbao for about six months. At the time he was employed by Anchor, it had a one-man sales office in Paris and owned a minority share in a manufacturing facility in Grenoble, France. Anchor's operations in Europe were located in France and it felt that its salesman was not aggressive enough to develop a European market. It desired to develop markets for its valves in England, Scandanavia, Germany, Switzerland, Italy, and other countries. From May through September 1972, petitioner prepared himself for his European assignment by learning about Anchor's valves and the nuclear power business at Anchor's location in the United States. *523 At the end of September 1972, petitioner went to Bilbao, Spain, where Babcock and Wilcox was headquartered. In Bilbao an engineer employed by Anchor was assigned to him. Petitioner acted as a liaison between Anchor in the United States and the local operation. He received drawings which were interpreted for the operations in Spain. Before petitioner left the United States he sold his automobile and purchased another automobile in Spain. He resided in a hotel in Bilbao where he had all of his possessions, i.e., all of his clothes for all seasons, his stereo and skis. Petitioner spoke Spanish fluently and he socialized basically with Spanish people and with some Americans. By April 1973, Anchor decided that petitioner had developed the Spanish operations sufficiently that his presence in Bilbao was no longer needed and he should begin to develop markets for Anchor in other parts of Europe. Therefore, in April 1973, petitioner moved to Paris where he rented a furnished apartment on Rue de Bac. He was attached to the French company and sales office in Paris from which he contacted power companies and engineering firms located in Belgium, United Kingdom, Scandanavia, Germany, *524 Switzerland and Italy. He belonged to the Harvard Business Club of Paris, a French-speaking social club. While living in Paris during the period from April 1973 to December 1973, petitioner had a bank account there, he dated French women and knew no Americans. He had his automobile, stereo and other possessions with him. On December 15, 1973, Anchor had petitioner return to the United States and write a report on how he should conduct Anchor's business in Europe because they were not achieving their objectives. When petitioner returned to the United States it was anticipated that he would be here no longer than one month so he left his automobile and other belongings in Paris. The report he wrote was not very well received and petitioner did not return to Europe until February 15, 1974. It was decided that he would be located at or near Geneva, Switzerland, because of its accessibility for air travel and its proximity to the plant in Grenoble. Upon petitioner's arrival in Geneva he learned that it was impossible to obtain a work permit there so he leased an office and an apartment in Ferney Voltaire, a French suburb of Geneva adjacent to the Geneva airport. He entered *525 into a written lease for the office which was a month-to-month lease. The lease was negotiated with a lawyer who was also the town lawyer, town mayor and a French official. He also assisted petitioner in his attempt to obtain a work permit. While at Ferney Voltaire petitioner paid renter's tax on his apartment and entered the local social scene. His difficulties with the Paris office increased and, in October 1974, Anchor decided petitioner should return to the United States which he did in November 1974. He brought all of his possessions to the United States where he remained throughout the remainder of 1974. Shortly thereafter he terminated his employment with Anchor and went into business for himself, helping United States businesses with the European market, operating out of New York City. He conducted business in this manner for approximately one year with some success and was offered an expense-paid permanent assignment in Europe but turned it down because he was 32 years of age, tired of traveling and desirous of getting married and settling down. During the time petitioner resided in Europe he generally vacationed there. When he returned to the United States temporarily *526 he purchased round-trip tickets in Europe. While in Ferney Voltaire petitioner began proceedings to obtain a resident visa but they were interrupted when he returned to the United States. At all times he was in Europe on a tourist visa. He found no need for a resident visa because his frequent travel allowed the 90-day revalidation of his tourist visa with little difficulty. It was petitioner's understanding that he would be liable for French income tax if he had a resident visa. Petitioner paid no income taxes to Spain or France. On his U.S. income tax return for the taxable year 1974, petitioner excluded from income $ 16,712 of his income earned while in France and indicated on a schedule to that return that he was subject to income tax in France. Anchor withheld Pennsylvania income tax from petitioner's pay during 1974. In his statutory notice of deficiency the Commissioner determined that petitioner failed to establish that he was a bona fide resident of a foreign country during 1974 and, therefore, not entitled to the income exclusion benefits of section 911(a)(1) of the Code. ULTIMATE FINDING OF FACT From January 1, 1973 through November 1, 1974, petitioner was *527 a bona fide resident of a foreign country. OPINION Petitioner graduated from the Harvard Business School in 1967 and his first employment was in Chile, where he remained for one and one-half years. He worked in Washington, D.C., for a year, then in Tanzania for a year. After that assignment he moved to Paris where he studied French for approximately eight months. He then returned to the United States after unsuccessful attempts to obtain employment in Europe. He sought an overseas assignment which he obtained in May 1972. After a period of orientation he moved to Spain in September 1972 and then to France in April 1973 and worked for the same employer until he returned to the United States in November 1974 at which time he terminated his employment. Only the taxable year 1974 is before us. Petitioner claims that the income he received from January 1, 1974 through October 31, 1974, was earned while a bona fide resident of a foreign country. The year 1973 is important, however, because petitioner claims to have been a bona fide resident of a foreign country during the entire year. Respondent contends that petitioner was not a bona fide resident during 1973 or 1974. Section *528 911(a)(1) of the Code allows a taxpayer to exclude from gross income that portion of income earned while a bona fide resident of a foreign country provided he offers "strong proof" and the period outside the United States includes a full year. The question is factual and its resolution depends upon all of the facts and circumstances. Nelson v. Commissioner, 30 T.C. 1151 (1958); [2]Sochurek v. Commissioner, 300 F.2d 34 (7th Cir. 1962). Section 1.911-1(a)(2), Income Tax Regs., provides that the question of bona fide residence in a foreign country for purposes of exclusion of income shall be determined, to the extent feasible, by section 871 and the regulations thereunder. Section 1.871-2(b), Income Tax Regs., provides that the question of whether or not a taxpayer is a "transient" or "sojourner" as opposed to a resident is to be determined by "his intentions with regard to the length and nature of his stay." The intent of the taxpayer is of paramount importance, Dawson v. Commissioner, 59 T.C. 264, 268 (1972). Eleven criteria were set forth for examining the *529 question of residency in Sochurek v. Commissioner, supra, [3] which we adopted in Dawson v. Commissioner, supra.
The burden of proof is on petitioner to show that *530 he was a bona fide resident of a foreign country. Rule 142(a), Tax Court Rules of Practice and Procedure. He must meet that burden by "strong proof." Schoneberger v. Commissioner, 74 T.C. 1016, 1024 (1980). Based upon our examination of the entire record in light of the eleven criteria we conclude that petitioner has sustained his burden of proof that he was a bona fide resident of a foreign country from January 1, 1973 through October 31, 1974. Respondent argues that petitioner intended to stay in Spain only six months when he moved there in 1973. The six-month period related only to his work at Bilbao; his overall objective and that of his employer, i.e., to develop an European market, had no such limit. Petitioner's intention to become a resident of Spain and France is supported by his actions dating back to his graduation from Harvard Business School. Petitioner's testimony as to his intention was credible and we believe him. He was a candid, forthright and convincing witness. Petitioner satisfactorily explained his use of a tourist visa. It must be borne in mind that although petitioner resided in Spain and France he traveled a great deal around Europe *531 for business purposes. Although petitioner did not pay income taxes in Spain or France, that alone is not dispositive of the issue of his status as a resident. Schoneberger v. Commissioner, supra, at 1028. Likewise, withholding of Pennsylvania income tax from petitioner's salary is only one factor to be considered. Schoneberger v. Commissioner, supra, at 1028. Respondent argues that when petitioner entered Spain and France using a tourist visa, he represented to customs officers that he was not a resident of those respective countries. Because customs officers are authorities of the governments they represent, respondent contends that section 911(c)(6) of the Code, added by the Revenue Act of 1962, establishes conclusively that petitioner was not a bona fide resident of a foreign country. That section provides as follows: SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES. (c)(6) TEST OF BONA FIDE RESIDENCE.--A statement by an individual who has earned income from sources within a foreign country to the authorities of that country that he is not a resident of the country, if he is held not subject as a resident of that *532 country to the income tax of that country by its authorities with respect to such earnings, shall be conclusive evidence with respect to such earnings that he is not a bona fide resident of that country for purposes of subsection (a)(1). It would appear that petitioner's situation does not fall within the terms of section 911(c)(6) because no taxing authorities determined that petitioner's earnings were not subject to taxation in Spain or France. Nevertheless, it is clear that the "authorities" referred to in section 911(c)(6) do not include immigration officials because we have recently held that immigration laws are not conclusive on the issue of residency for Federal tax purposes. Schoneberger v. Commissioner, supra, at 1027. We hold that petitioner has sufficiently met the applicable criteria to be a bona fide resident of a foreign country for the period from January 1, 1973 through October 31, 1974. Accordingly, he is entitled to exclude from income for 1974 earnings for the period from January 1, 1974 through October 31, 1974. Decision will be entered for the petitioner. Footnotes
1. All statutory references are to the provisions of the Internal Revenue Code of 1954 in effect during 1973 and 1974 unless otherwise indicated.↩
2. Ross v. Commissioner, T.C. Memo. 1974-221↩.
3. (1) intention of the taxpayer; (2) establishment of his home temporarily in the foreign country for an indefinite period; (3) participation in the activities of his chosen community on social and cultural levels, identification with the daily lives of the people and, in general, assimilation into the foreign environment; (4) physical presence in the foreign country consistent with his employment; (5) nature, extent and reasons for temporary absences from his temporary foreign home; (6) assumption of economic burdens and payment of taxes to the foreign country; (7) status of resident contrasted to that of transient or sojourner; (8) treatment accorded his income tax status by his employer; (9) marital status and residence of his family; (10) nature and duration of his employment; whether his assignment abroad could be promptly accomplished within a definite or specified time; (11) good faith in making his trip abroad; whether for purpose of tax evasion.↩